## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>v.<br><br>**[2] ALEISHA GARCÍA-SANJURJO,**<br>Defendant. | Criminal No. 19-542 (GAG/BJM) |

### REPORT AND RECOMMENDATION

On August 24, 2019, law enforcement agents stopped all passengers traveling by ferry from Culebra to Ceiba, Puerto Rico to allow a trained, drug-sniffing dog to inspect their luggage. Officers were looking for Aleisha Marie García-Sanjurjo ("García") and Lyneishka Ramos-Velazquez ("Ramos") (collectively "codefendants"), who were suspected of transporting drugs on the ferry. The dog alerted to codefendants' bag, and officers found a substance alleged to be cocaine inside. Codefendants were indicted by grand jury and charged with conspiracy to possess with intent to distribute cocaine and possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii), and 846. Docket No. ("Dkt.") 17. García moved to suppress all evidence based on unlawful search and seizure. Dkt. 23. The government opposed, Dkt. 33, and García replied, Dkt. 40. The matter was referred to me for a report and recommendation. Dkt. 41. I held a suppression hearing on April 22, 2021, and a transcript was produced. Dkts. 69, 70. Parties submitted post-hearing briefs. Dkts. 77, 79. For the reasons that follow, the motion to suppress should be **DENIED**.

### BACKGROUND

The following account of the facts is drawn from the testimonial and documentary evidence received at the hearing. The government presented the following witnesses: FBI Task Force Officer Sgt. Anthony Ayala ("Ayala"), FBI Task Force Officer Eduardo Ruisanchez ("Ruisanchez"), FBI Special Agent Robert Maj ("Maj"), and FBI Task Force Officer Christopher Esteves ("Esteves").

Culebra, Puerto Rico is a municipal island off the coast of the main island of Puerto Rico. To travel from Culebra to the main island, one can take a public ferry or an airplane. Dkt. 70 at 58-

60. Culebra also has some number of private docks, which fisherman or others might use for private transport. *Id.* Those traveling by ferry from Culebra to Ceiba, which is located on the main island, pass through an outdoor dock area in Culebra before boarding the ferry. *See* Ex. 4. Posted at that dock is the following sign, translated both into Spanish and English:

> Effective July 1, 2004, new federal regulations came into effect for maritime security. For this reason, users should know the following:
>
> Boarding any vessel of the system implies a consent for search and inspection. Boarding will not be permitted to passengers who do not consent to search and inspection.
>
> Every person, equipment, personal effect or vehicle is subject to random security inspections. The weight and amount of equipment may be limited.
>
> Identification or other documents may be requested to any passenger, crew member, employee from the Authority or any other governmental entity or visitor interested in boarding a vessel.
>
> The United States Coast Guard is authorized to perform inspections without prior notification, which could result in delays.

*Id.* Another sign provides as follows:

> All persons and vehicle [sic] beyond this point are subject to search by security personnel. Search is a requirement for boarding according to the USCG MARSEC Level in effect.

*Id.*

On August 24, 2019, both these signs were posted somewhere at the Culebra dock, though the dock was also undergoing construction at that time. Dkt. 70 at 117.

On that date, García and her codefendant traveled on an afternoon ferry from Culebra to Ceiba. Sometime before they landed in Ceiba, a confidential informant called Ayala to share information about potential criminal activity. *Id.* at 10. According to the informant, two women would be traveling on the 1:00 p.m. ferry from Culebra to Ceiba, and they would be transporting drugs. *Id.* at 13-14. One of the women, named Aleisha, would be wearing a purple shirt and would have her hair tied in a bun. *Id.* at 14. The second woman, called "La Flaca," would have her hair loose. *Id.* at 14. The informant also sent Ayala two pictures of the women by text message. *Id.* at 14, 27; *see* Ex. 1, Ex. 2.

The informant had worked with Ayala on a few other cases, three of which made it to court, including the instant suit. Dkt. 70 at 21. Of those three cases, Ayala had been able to corroborate the information the informant provided, and all had resulted in the seizure of drugs, money, or fugitives. *Id.* at 23, 44.

After speaking with the informant, Ayala shared the information he had learned and the pictures he had received with his colleagues. *Id.* at 19, 45, 72-73, 142-43. Although Ayala was off-duty and could not go to Ceiba, about five officers, including Officers Ruisanchez, Maj, and Esteves, headed to the dock at Ceiba to await the ferry. *Id.* at 28, 75. They wore civilian clothes and carried firearms, although these remained holstered. *Id.* at 75.

Once the ferry arrived, officers worked together to inspect every passenger as they disembarked. *Id.* at 77-78, 120. The inspections proceeded as follows. Officers would remove passengers from the vessel in groups of twenty to twenty-five people. *Id.* at 77. Private security guards helped unload the ship, some officers were looking at passengers to see if anyone matched the informant's description, some were working the security perimeter, and some were outside providing surveillance. *Id.* at 76-79. These duties were performed by about five officers. *Id.* at 79.

Passengers exiting the ferry would walk through a fenced-in area that forms something like a hallway, and they would find that there is only one way to exit. *Id.* at 119. Ruisanchez would tell passengers to form a line, put their bags in front of them, and step back. *Id.* at 77. Esteves would then walk down the line with a drug-sniffing dog, who would sniff people's belongings. *Id.* at 77-78. If the dog had sniffed a passenger's bag and did not alert, an officer would inform the passenger that he or she could leave the dock. *Id.* at 79. It took about three to five minutes from the first person in the group to the last person in that group to inspect the bags with a dog, and then a few more minutes would pass while the next group was lined up. *Id.* at 82, 146.

At some point, Maj observed two women disembarking the ferry who, in some regard, fit the description provided by the informant. *Id.* at 83-84, 133-34. They disembarked with the second, third, or fourth group. *Id.* at 83, 146. In one of these groups, Esteves was walking down the line of luggage with his drug-sniffing dog, when the dog alerted to a purple bag with gray detailing. *Id.* at

147-48; *see* Ex. 6. Esteves informed Ruisanchez that the dog had alerted and continued down the line inspecting luggage.[1] Dkt. 70 at 79, 83-85, 146-47.

Two women, including García, were standing with the bag. *Id.* at 84-85. Ruisanchez noticed that one of them was wearing a purple shirt and looked like the woman named Aleisha in the picture provided by the informant. *Id.* at 84-85. He and Maj approached to question the women. *Id.* at 79, 84-85. Ruisanchez introduced himself to the two women with his credentials and asked for the women's names and for identification because the dog had alerted. *Id.* at 85-86, 104. He noticed that the two women were looking at each other nervously and shaking. *Id.* at 86, 88. Neither he nor Maj drew their weapons, and both spoke in a calm and normal tone. *Id.* at 86, 88. Ruisanchez then asked who the bag belonged to, and they replied that it belonged to both of them. *Id.* at 87. He asked whether they had any firearms, controlled substances, valuables, or cash inside the bag, and they both said no. *Id.* Next, he asked if they would give consent for him to go into the bag, and García answered "yes." Dkt. 70 at 89. *Id.* García opened the bag, and Ruisanchez saw clothes. *Id.* at 90. Ruisanchez then asked if García would allow him to do that, and she agreed. *Id.* at 90, 126.

Ruisanchez reached into the bag and felt a hard mass in the shape of a rectangle. *Id.* at 90-91. Based on his years of experience as a law enforcement officer, he believed it to be a block of cocaine. *Id.* at 90. Maj then arrested both García and Ramos, and officers took them to an official government vehicle. *Id.* at 91, 93. Inside the car, officers read codefendants official FBI consent forms in Spanish. *Id.* at 92. One form gave officers permission to search the purple bag and another allowed officers to search García's cell phone. *Id.* at 92-94. García signed the forms. *Id.* at 96.

## DISCUSSION

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[A] search done without a warrant supported by probable cause is presumptively unreasonable

---

[1] At the suppression hearing, the government offered evidence related to the dog's training and practices. *See id.* at 137-42. Because García does not challenge the reliability of the dog sniff, I do not summarize that testimony here.

unless an exception to the warrant requirement applies." *United States v. McGregor*, 650 F.3d 813, 820 (1st Cir. 2011). "On a motion to suppress evidence seized on the basis of a warrantless search, the presumption favors the defendant, and it is the government's burden to demonstrate the legitimacy of the search." *United States v. Delgado-Perez*, 867 F.3d 244, 250 (1st Cir. 2017) (internal quotation marks and citation omitted).

Here, García experienced both a warrantless search and seizure. The government invokes several exceptions to the warrant requirement to argue that officers' conduct was reasonable, contending that (1) any search was authorized by federal regulations and reasonable as an administrative or special needs search; (2) García consented to search by boarding the ferry; (3) García's initial seizure was supported by reasonable suspicion in light of the confidential informant's tip; (4) García consented to search of her bag; and (5) probable cause supported García's subsequent warrantless arrest. García disagrees on all counts. I will address each argument in turn.

First, the government argues that any search it conducted here was authorized by federal law requiring certain maritime facilities and vessel owners to implement security measures. The security protocols at the Ceiba and Culebra docks trace their origins to the Maritime Transportation Security Act of 2002 ("MTSA"), a law enacted by Congress in the wake of the September 11, 2001 terrorist attacks. *See Cassidy v. Chertoff*, 471 F.3d 67, 70 (2d Cir. 2006). With that law, Congress aimed to detect and deter "transportation security incident[s]," defined as "security incident[s] resulting in a significant loss of life, environmental damage, transportation system disruption, or economic disruption in a particular area." 46 U.S.C. § 70101(6). To further this goal, the MTSA created "a set of nationwide directives for increasing both vessel and port security." *Cassidy*, 471 F.3d at 70. It instructed the Department of Homeland Security ("DHS") to determine what sorts of vessels and facilities might be involved in a transportation security incident and required that operators of those vessels and facilities prepare and implement security plans that would "deter[] a transportation security incident to the maximum extent practicable." 46 U.S.C. § 70103.

The Coast Guard issued implementing regulations, one of which is titled, "Security measures for access control." 33 C.F.R. § 105.25. That regulation requires certain vessel and facility owners to implement security measures that would "[d]eter the unauthorized introduction of dangerous substances and devices, including any device intended to damage or destroy persons, vessels, facilities, or ports" and to "[c]ontrol access to the facility." *Id.* § 105.255(a). Facilities operating at "MARSEC Level 1" must also "[s]creen persons, baggage (including carry-on items), personal effects, and vehicles, for dangerous substances and devices at the rate specified in the approved [Facility Security Plan]." *Id.* § 105.255(d)(2).

At the outset, it is unclear that these regulations contemplate the type of search that occurred in the instant case. First, it is not clear that the regulations allow officials to search for controlled substances, which is what officers in this case were seeking. The regulations aim to prevent "dangerous substances and devices" from entering maritime facilities. This means preventing entry of any "material, substance, or item that reasonably has the potential to cause a transportation security incident," defined as an "incident resulting in a significant loss of life, environmental damage, transportation system disruption, or economic disruption in a particular area." *Id.* § 101.105. The government (or at least Ruisanchez) suggests that "controlled substances are considered a dangerous substance since large amounts of controlled substances are worth significant amounts of money," and these are thus "of great interest to criminal organizations that often employ violence to obtain or protect the substance." Dkt. 79 at 15. But by this logic, any item worth a "significant amount of money"—a diamond ring, for instance—would be considered a "dangerous substance" under the MTSA. Without doubt, a "dangerous substance" would include a bomb, explosive device, or some other "device intended to damage or destroy persons, vessels, facilities, or ports." 33 C.F.R. § 105.255(a). But the government's case that said term includes controlled substances is weak at best.

Second, it is not clear that the regulations authorize searches that occur after a vessel has already completed its journey and passengers have disembarked. The regulations require facilities to "[s]creen persons, baggage (including carry-on items), personal effects, and vehicles, for

dangerous substances and devices." *Id.* § 105.255(d)(2). "Screening means a reasonable examination of persons, cargo, vehicles, or baggage for the protection of the vessel, its passengers and crew." 33 C.F.R. § 101.105. The government suggests that a "screening" may occur before passengers board a ferry, during the voyage, or after passengers disembark. But conducting a "screening" after the voyage does little to protect "the vessel, its passengers and crew," who have already been traveling on the ferry alongside whatever dangerous substances or devices might be present. *Id.* Indeed, the purpose of the screening is "to secure the vital government interest of protecting vessels, harbors, and waterfront facilities from destruction, loss, or injury from sabotage or other causes of similar nature." *Id.* By waiting until passengers arrive at Ceiba to "screen" them, facility owners essentially fail to protect those passengers from the "real danger of violence" that might be present on the ferry, thus undermining the purpose of the screening itself. *Id.*

But even assuming that the MTSA and its implementing regulations authorize a search for controlled substances after passengers have completed their journeys and disembarked from the ferry, that search must nonetheless be reasonable under the Fourth Amendment. Relevant here is the "administrative" or "special needs" exception to the warrant requirement, to which courts often look when assessing transit security screenings. *Ruskai v. Pistole*, 775 F.3d 61, 68 (1st Cir. 2014). Officers need not have probable cause to support a search "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Griffin v. Wisconsin,* 483 U.S. 868, 873 (1987) (internal quotation marks omitted). To determine whether a search is permissible under this doctrine, courts "balance[] the public interest in the [search] against the privacy concerns implicated" thereby. *Natl. Treas. Employees Union v. Von Raab*, 489 U.S. 656, 679 (1989). In the First Circuit, courts "focus on 'the gravity of the public concerns,' 'the degree to which the [search] advances the public interest,' and 'the severity of the interference with individual liberty.'" *Ruskai*, 775 F.3d at 68–69 (quoting *Illinois v. Lidster*, 540 U.S. 419, 427 (2004)). Although the government need not "adopt the least intrusive practicable alternative, there must be a fairly close fit between the weight of the government's interest in searching and the intrusiveness of the search." *Id.* at 69.

United States v. García-Sanjurjo, Criminal No. 19-542 (GAG/BJM)                    8

Here, I question the degree to which any such fit is "fairly close." *Id.* On one hand, the search here was at least somewhat intrusive. García was waiting between fifteen and thirty minutes to allow officers to eventually pass a drug-sniffing dog by her bag.[2] Although a narcotics-detection dog sniff is minimally intrusive and reveals only the "location of a substance that no individual has any right to possess," *Illinois v. Caballes*, 543 U.S. 405, 410 (2005), Ruisanchez's search of García's bag involved "rummaging through the contents of [her] luggage," thus "expos[ing] noncontraband items that otherwise would remain hidden from public view." *United States v. Place*, 462 U.S. 696, 707 (1983). Although many searches are far more intrusive than this one, it cannot be said that this intrusion was minimal. *Accord Cassidy*, 471 F.3d at 77 (finding that ferry passengers enjoyed an undiminished privacy interest in their carry-on luggage).

On the other hand, it is not clear exactly which interest the government aims to protect with a post-journey search. It asserts having a general interest in enforcing maritime security, but it fails to distinguish that interest from traditional criminal law enforcement, which is not contemplated under the special needs search exception. *See United States v. Weikert*, 504 F.3d 1, 7 (1st Cir. 2007) ("[G]eneral interest in crime control could not qualify as a special need.") (internal quotation marks and citation omitted). Certainly, the government has a strong interest in preventing dangerous substances and devices from entering a dock or ferry and thus preventing any incident resulting in "significant loss of life, environmental damage, transportation system disruption, or economic disruption in a particular area." 46 U.S.C. § 70101(6). Indeed, the Second Circuit has found that "the prevention of terrorist attacks on large vessels engaged in mass transportation and determined by the Coast Guard to be at heightened risk of attack constitutes a 'special need.'" *Cassidy*, 471 F.3d at 82. And the First Circuit has determined that the government's interest in keeping weapons off commercial flights justifies TSA pat-downs. *See Ruskai*, 775 F.3d at 69. But it is not clear how the government's interest in preventing dangerous devices from entering a ferry extends to the time

---

[2] García was in the second, third, or fourth group of passengers who disembarked the ferry and then waited while a dog sniffed the passengers' luggage. Dkt. 70 at 83, 146. It took about five minutes for each group to be searched and roughly three minutes to transition between groups. *Id.*

*after* the ferry has already reached its destination and passengers have disembarked. At that point, any dangerous substances have already entered the dock at Culebra and traveled on the ferry, threatening to harm its passengers.[3]

Perhaps sensing this weakness, the Government backs off from its special needs search argument, instead suggesting that any search or seizure was justified by García's consent. *See* Dkt. 79 at 16. Justification for the search on a consent theory, however, is also problematic.

As with a special needs search, officers need neither probable cause nor a warrant when they obtain consent to search. *United States v. Reynolds*, 646 F.3d 63, 72 (1st Cir. 2011). That consent may be either express or implied. *Id.* "It is the prosecution's burden to establish, by a preponderance of the evidence, that consent was freely and voluntarily given." *United States v. Perez-Montanez*, 202 F.3d 434, 438 (1st Cir. 2000) (internal quotation marks and citation omitted). "Consent is voluntary if it is 'the product of an essentially free and unconstrained choice.'" *United States v. Chhien*, 266 F.3d 1, 7 (1st Cir. 2001) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). It is not voluntary if "granted only in submission to a claim of lawful authority." *Bustamonte*, 412 U.S. at 233.

"The existence of consent and the voluntariness thereof are questions of fact to be determined from all the circumstances surrounding the search." *Reynolds*, 646 F.3d at 72 (internal quotation marks and citations omitted). In making this determination, the court looks to various factors, including the "consenting party's age, education, experience, intelligence, and knowledge of the right to withhold consent," as well as "whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or

---

[3] I do not suggest that the special needs exception cannot authorize searches carried out under the MTSA. To the contrary, the Second Circuit relied on the special needs search exception when it upheld certain warrantless searches of ferry commuters. *Cassidy*, 471 F.3d at 87. In that case, two commuters challenged a policy that required passengers to submit to security checks before boarding the ferry. *Id.* at 74. The court upheld the searches under the special needs exception, explaining that the searches entailed only brief, visual inspections with ample notice of the potential search; the government had a strong interest in preventing terrorist attacks on large, mass transit vessels; and the searches were reasonably effective. *Id.* at 78-87. In contrast, here the government has done little to explain its interest in post-journey searches aside from its general interest in the enforcement of criminal law.

United States v. García-Sanjurjo, Criminal No. 19-542 (GAG/BJM)                    10

under inherently coercive circumstances." *United States v. Forbes*, 181 F.3d 1, 5 (1st Cir. 1999) (internal quotation marks and citations omitted).

Here, the government argues that García implicitly consented to search by boarding the ferry because, at the Culebra dock, there are two signs informing passengers that they are subject to search. In raising this argument, the government wades into an area of law fraught with disagreement.

"Courts confronted with claims of implied consent have been reluctant to uphold a warrantless search based simply on actions taken in the light of a posted notice. This hesitancy stems from the importance of the right at stake and the elusiveness of consent." *McGann v. N.E. Illinois Regl. Commuter R.R. Corp.*, 8 F.3d 1174, 1180 (7th Cir. 1993). As one commentator explains, "[c]onsent in any meaningful sense cannot be said to exist merely because a person (a) knows that an official intrusion into his privacy is contemplated if he does a certain thing, and then (b) proceeds to do that thing. Were it otherwise, the police could utilize the implied consent theory to subject everyone on the streets after 11 p.m. to a search merely by making public announcements in the press, radio[,] and television that such searches would be undertaken." Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 8.2(l) (6th ed.) (citations and internal quotation marks omitted); *see also United States v. Davis*, 482 F.2d 893, 905 (9th Cir. 1973), *overruled on other grounds by United States v. Aukai*, 497 F.3d 955 (9th Cir. 2007) ("The government could not avoid the restrictions of the Fourth Amendment by notifying the public that all telephone lines would be tapped, or that all homes would be searched.").

Compounding these concerns is the degree to which any consent that could be implied by boarding the ferry is voluntary, given that individuals have few options for leaving the small island of Culebra. The government offered evidence showing that those wishing to leave Culebra to access the main island of Puerto Rico may travel by ferry or by plane. Dkt. 70 at 58-60. Testimony also suggested that Culebra has some unknown number of private docks that fisherman and others might use to leave the island. *Id.* But details regarding the practical availability of these private alternatives for transit are missing. Although these might be available to those with access to

private boats or planes, the government has not shown that García has any meaningful access to transport from Culebra to the main island that would allow her to decline a search. Although these facts alone may not show that any consent was "coerced" as that term is used in Fourth Amendment jurisprudence, they are nonetheless relevant to the totality of the circumstances the court must assess in determining whether consent, if extant, was voluntary.

Also problematic is the degree to which the signs at the Culebra dock notify passengers that they are subject to search, and if so, whether they sufficiently explain the extent of any potential search. At least one court has found that ferry passengers had not implicitly consented to search where notice of a potential search was made by two general announcements informing passengers boarding the ferry that they would be subject to search and by similar notice provided on the ferry schedule. *United States v. Graham*, 117 F. Supp. 2d 1015, 1020–21 (W.D. Wash. 2000). The court explained that the notice provided was not enough to show implied consent because the notice was not prominent and could easily be missed, it provided little information about the extent of the search or the grounds for that search, and there was "no certainty that passengers boarding the ferry [would] actually see or read the ferry schedule" or hear the announcements. *Id.*

Here too, there is no evidence showing that García read or understood the signs, nor is there any reasonable assurance that passengers generally read such signs. And even if the signs were "prominently displayed,"[4] and even if a prominently displayed sign could be enough to show that

---

[4] García argues that the government failed to show that the signs were present at the Culebra dock on August 24, 2019. Ruisanchez testified that he had been to the Culebra dock some time before August 2019 (possibly in 2018 or 2019) and that he had been there some time after August 2019. Dkt. 70 at 63, 116-17. He then affirmed that the signs at the Culebra dock appeared as pictured in Exhibit 4 on both of those occasions. *Id.* at 63-65. Additionally, federal regulations require that such signs be posted, 33 CFR § 105.255(d)(3), increasing the likelihood that they were in fact posted. I find that this is enough to show that the signs were posted somewhere at the Culebra dock on August 24, 2019. However, I cannot say that they were posted such that passengers boarding the ferry would likely see and read them. Testimony showed that the Culebra dock was under construction in August 2019, but there are no details on the nature of that construction. Dkt. 70 at 117. Thus, it is not clear whether the construction affected the location of the signs or the route passengers would follow to board the ferry.

United States v. García-Sanjurjo, Criminal No. 19-542 (GAG/BJM)                                12

ferry passengers implicitly consent to search by boarding,[5] the signs fail to provide notice of the extent or nature of the search to which passengers are subject. One sign contains the following language:

> Effective July 1, 2004, new federal regulations came into effect for maritime security. For this reason, users should know the following:
>
> Boarding any vessel of the system implies a consent for search and inspection. Boarding will not be permitted to passengers who do not consent to search and inspection.
>
> Every person, equipment, personal effect or vehicle is subject to random security inspections. The weight and amount of equipment may be limited.
>
> Identification or other documents may be requested to any passenger, crew member, employee from the Authority or any other governmental entity or visitor interested in boarding a vessel.
>
> The United States Coast Guard is authorized to perform inspections without prior notification, which could result in delays.

Ex. 4. And a second sign reads as follows:

> All persons and vehicle [sic] beyond this point are subject to search by security personnel. Search is a requirement for boarding according to the USCG MARSEC Level in effect.

*Id.* These signs do little more than inform passengers that they are subject to "search and inspection" based on federal regulations governing "maritime security." These amorphous descriptors offer passengers little insight into what sort of search they might experience, raising questions about the scope of any consent. *See McGann v. N.E. Illinois Regl. Commuter R.R. Corp.*, 8 F.3d 1174, 1180 (7th Cir. 1993) (A "sign's blanket statement that a person 'is subject to search'

---

[5] In my view, this is a highly disputed area of law that has not been adequately briefed. In the context of airport security screenings, the First Circuit looks to the special needs search exception rather than to the doctrine of implied consent. *See Ruskai*, 775 F.3d at 68; *United States v. Doe*, 61 F.3d 107, 109–11 and n.7 (1st Cir. 1995) (analyzing airport security screening as administrative search and entertaining magistrate judge's implied consent theory only "assuming that airport security checkpoint searches are justified on the ground that the passenger's 'implied consent' is irrevocable" and finding that any consent "would be limited to permitting searches for the purpose of detecting weapons and explosives") (emphasis omitted). However, in a rather different context, the First Circuit has found implied consent to seizure where the owner of a taxi voluntarily enrolled in a safety stop program, whereby police would stop taxis for their own safety, "and decals festooned the vehicle, and the conspicuousness of the display put the driver squarely on notice that the owner had enrolled the cab in the [] program. *United States v. Woodrum*, 202 F.3d 1, 10 (1st Cir. 2000).

... does not readily inform the person of the grounds for the search, the extent of the search or the frequency or regularity of the searches. The person's conduct therefore does not clearly establish that the person consented to the particular search in question.").

"Warrantless searches may not exceed the scope of the consent given. The scope of consent is measured by a test of objective reasonableness: what would the typical reasonable person have understood by the exchange between the officer and subject?" *United States v. Casellas-Toro*, 807 F.3d 380, 391 (1st Cir. 2015) (internal quotation marks and citations omitted). A reasonable person who had read and understood these signs might expect some intrusion relevant to "maritime security"—that is, an inspection intended to promote safety aboard the vessel. But a search after the ferry has completed its voyage and passengers have disembarked does nothing to promote safety on a ferry that has already finished transporting passengers and whatever dangerous substances they may be carrying. Moreover, a reasonable person who had read and understood the words, "[s]earch is a requirement for boarding," would expect that any search to which they might be consenting would occur prior to boarding. Accordingly, even if ferry passengers implicitly consent to search by passing by the signs at the Culebra dock and then boarding the ferry, the scope of the search to which they consent does not include post-voyage searches, whether or not for controlled substances.

Given the totality of the circumstances here, I find that the government has not met its burden to show that García—by boarding the ferry—implicitly consented to the search officers performed.

But that does not decide the matter. The government also argues that any search or seizure was reasonable because the informant's tip created reasonable suspicion and thus authorized a brief seizure. García disagrees, contending that the informant's tip should be treated with skepticism in light of the affidavit filed with the complaint, and that, alternatively, officers needed probable cause, which they lacked, because García's seizure amounted to an arrest. To resolve this dispute, I first ask at what moment García was initially seized and whether any seizure constituted a brief investigatory stop—a Terry stop—or an arrest.

A person may be seized either by physical force or by "acquisition of control." *Torres v. Madrid*, 141 S. Ct. 989, 1001 (2021). The latter "involves either voluntary submission to a show of authority or the termination of freedom of movement." *Id.* Such a seizure occurs if, "'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave,'" *Brendlin v. California*, 551 U.S. 249, 255 (2007) (quoting *Mendenhall*, 446 U.S. 544, 554 (1980)), or, in certain instances, where a reasonable person interacting with a law enforcement officer would not feel free to "decline the officers' requests or otherwise terminate the encounter," *Florida v. Bostick*, 501 U.S. 429, 436 (1991); *see also United States v. Dapolito*, 713 F.3d 141, 147–48 (1st Cir. 2013) ("An individual is detained when a reasonable person would not feel free to refuse to answer police questions and proceed along his way."). "'[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter.'" *United States v. Smith*, 423 F.3d 25, 29 (1st Cir. 2005) (quoting *Bostick*, 501 U.S. at 439).

Here, García, like all other passengers aboard the ferry, could only exit the ferry as permitted by officers, who allowed passengers to disembark in groups of twenty to twenty-five people. *Id.* at 77. Upon disembarking, García passed through a fenced-in security area—the only way to exit the ferry—and an armed officer wearing civilian clothes told her and other passengers to form a line, place their luggage on the ground, and step back. *Id.* at 77-79. Another armed officer wearing civilian clothes then walked alongside the luggage with a drug-sniffing dog. *Id.* at 77-78, 144-47. It was not until after passengers complied with officers' instructions and the dog had sniffed their luggage that Ruisanchez "would give them the release in order for them to be able to leave." *Id.* at 78. A reasonable person under these circumstances would not feel free to move along without complying with the officers' instructions. To the contrary, when Ruisanchez instructed García to place her bag on the ground and step back, he used a "show of authority" to restrain her

liberty, and she complied. *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). Accordingly, at that moment, García had been seized.[6]

 Under the Fourth Amendment, a seizure is reasonable where it amounts to no more than a brief investigatory stop, and it is supported by "reasonable and articulable suspicion" of past or present criminal activity. *United States v. McCarthy*, 77 F.3d 522, 529 (1st Cir. 1996). However, "[w]here police actions taken during the detention exceed what is necessary to dispel the suspicion that justified the stop, the detention may amount to an 'arrest' and is lawful only if it is supported by probable cause." *Flowers v. Fiore*, 359 F.3d 24, 29–30 (1st Cir. 2004) (citing *United States v. Quinn*, 815 F.2d 153, 156 (1st Cir. 1987)). Rather than rely on a "litmus-paper test," the First Circuit instructs that a Terry stop becomes an arrest "when a reasonable man in the suspect's position would have understood his situation, in the circumstances then obtaining, to be tantamount to being under arrest." *Id.* at 29 (internal quotations marks and citations omitted). Determining when a stop becomes an arrest, then, requires a fact-intensive analysis. *Id.* at 29-30. Indeed, officers might draw their weapons, use handcuffs, call for backup, or place someone in the back of a police vehicle without necessarily converting a stop into an arrest. *Id.* at 30. But a stop could amount to an arrest where officers place an individual in handcuffs, transport him against his will to an official holding area, confine him to a small interrogation room for more than a momentary period, and force him to miss his flight. *See United States v. Acosta-Colon*, 157 F.3d 9, 15-20 (1st Cir. 1998). To distinguish between such cases, the court must determine whether police conduct was "reasonable in light of the circumstances that prompted the stop or that developed during the course of the stop." *Flowers*, 359 F.3d at 30.

 Here, García's initial stop—that is, the moment at which she was instructed to place her bag in front of her and step back to allow for a dog sniff of her bag—had few, if any, arrest-like features. García was not placed in handcuffs or into the back of a police vehicle, and no officers drew their weapons. Although there were five officers in the area and García must have been

---

[6] It is without dispute that García's bag was also searched when Ruisanchez looked and reached inside it.

waiting between fifteen and thirty minutes to line up for the dog sniff, these facts are not enough to convert a Terry stop into an arrest. *See United States v. Rabbia*, 699 F.3d 85, 93 (1st Cir. 2012) (no de facto arrest where suspect was detained for thirty minutes); *United States v. Teemer*, 394 F.3d 59, 66 (1st Cir. 2005) (no de facto arrest where suspect was detained for "slightly over 30 minutes"); *United States v. Trueber*, 238 F.3d 79, 94 (1st Cir. 2001) (investigatory stop did not become full arrest where five officers were present at the scene and no more than two were in proximity to the suspect). Moreover, officers were telling every passenger who disembarked the ferry to stop for inspection, a fact that distinguishes García's initial stop from a traditional arrest, which typically involves one or a few people. I doubt that any reasonable person subject to such a large inspection would have understood everyone—including herself—to be under arrest.

Nor does the fact that the dog alerted and officers questioned García convert the stop into an arrest. Once the dog alerted, Ruisanchez and Maj approached García and her codefendant. *Id.* at 79, 84-85. Ruisanchez introduced himself with his credentials and asked codefendants if they had identification because the dog had alerted. *Id.* at 85. He then asked who the bag belonged to; whether codefendants had any firearms, controlled substances, valuables, or cash inside the bag; and whether they would allow him to go into the bag. *Id.* at 87. But mere questioning does not convert a stop into an arrest, *United States v. Quinn*, 815 F.2d 153, 156-58 (1st Cir. 1987) (no de facto arrest where police interrogated suspect for twenty to twenty-five minutes), particularly where such questioning occurs in public, *see United States v. Lee*, 317 F.3d 26, 31 (1st Cir. 2003) (fact that suspect was "detained and questioned in a public place" was factor weighing against arrest). Further, both Ruisanchez and Maj spoke in a "calm and normal" tone without ever drawing their weapons. *Id.* at 88. Nothing suggests that during this time their conduct became unreasonable "in light of the circumstances that prompted the stop or that developed during the course of the stop." *Flowers*, 359 F.3d at 30. Thus, at least through the time that the dog alerted and officers began questioning García, the stop, although a seizure, did not amount to a de facto arrest.

To determine whether the initial stop complied with the Fourth Amendment, then, the court must determine whether "officers had a 'reasonable and articulable suspicion' of past or present

criminal activity." *Flowers*, 359 F.3d at 30–32 (internal quotation marks and citation omitted). This requires considering "'(1) whether the officer's action was justified at its inception'; and '(2) whether it was reasonably related in scope to the circumstances justifying the interference in the first place.'" *Id.* at 32 (quoting *Terry*, 392 U.S. at 19–20). The court must "'balance[ ] the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion.'" *Id.* (quoting *United States v. Hensley*, 469 U.S. 221, 228 (1985)). In assessing reasonable suspicion, the court must consider the "totality of the circumstances of each case to see whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing." *Id.* at 273 (internal quotation marks omitted). This totality consists of "the facts available to the officer at the moment of the seizure or search." *United States v. Jones*, 700 F.3d 615, 621 (1st Cir. 2012) (internal quotation marks omitted). Like probable cause, reasonable suspicion is a "commonsense, nontechnical conception[] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas v. United States*, 517 U.S. 690, 695–96 (1996) (internal quotation marks and citations omitted).

Where, as here, officers conduct an investigatory stop based on a tip from a confidential informant, that tip can only justify the stop if, given the totality of the circumstances, the tip "possess[es] adequate indicia of reliability." *United States v. Brown*, 500 F.3d 48, 54 (1st Cir. 2007) (citing *Alabama v. White*, 496 U.S. 325, 332 (1990)). In assessing an informant's reliability, courts consider the following, non-exhaustive list of factors:

> (1) whether the affidavit establishes the probable veracity and basis of knowledge of persons supplying hearsay information; (2) whether an informant's statements reflect first-hand knowledge; (3) whether some or all of the informant's factual statements were corroborated wherever reasonable or practicable (e.g., through police surveillance); and (4) whether a law enforcement affiant assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's provided information.

*United States v. Veloz*, 948 F.3d 418, 426 (1st Cir. 2020), *cert. denied*, 141 S. Ct. 438 (2020) (internal quotation marks and citations omitted). This last factor looks to whether officers had

"independent knowledge" of the suspects' activities through its investigation. *United States v. Gonsalves*, 859 F.3d 95, 104 (1st Cir. 2017).

Here, although the government offered scant evidence of the informant's basis of knowledge, it offered some evidence relevant to the probable veracity of the tip. Indeed, Ayala testified that he had worked with the informant on a few other cases, three of which were ultimately filed in court.[7] Dkt. 70 at 21. In those cases, officers corroborated the information the informant provided and ultimately found contraband based at least in part on the tip. *Id.* at 21, 23, 44. That the informant had worked with Ayala in the past and already "provided trustworthy information" increases the likelihood that her August 24, 2019 tip was reliable. *United States v. Brown*, 500 F.3d 48, 55 (1st Cir. 2007); *see also Navarette v. California*, 572 U.S. 393, 398 (2014) ("[A]n informant who is proved to tell the truth about some things is more likely to tell the truth about other things."). Likewise, "the [informant] was known to the police and could be held responsible if [her] assertions proved inaccurate or false," increasing the likelihood that the tip was reliable. *Veloz*, 948 F.3d at 426–27 (internal quotation marks and citation omitted). Additionally, the informant offered several specific details about the women alleged to be transporting drugs, sharing not only pictures of the defendants, but accurately predicting their future behavior. Indeed, the informant predicted that two women would be traveling on the 1:00 p.m. ferry from Culebra to Ceiba; that one, named Aleisha, would be wearing a purple shirt and have her hair in a bun; and that the other, called La Flaca, would have her hair loose. Such predictions indicate that the informant had some familiarity with the women's affairs. *See Alabama v. White*, 496 U.S. 325, 332 (1990) (finding that investigatory stop was supported by reasonable suspicion where anonymous tipster had told police that a woman would be transporting cocaine from a particular apartment building to a particular motel in a brown Plymouth station wagon with a broken right tail light and where officers corroborated the innocent details) ("Because only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such

---

[7] One of those three cases is the present prosecution. Dkt. 70 at 21.

information is likely to also have access to reliable information about that individual's illegal activities."). And Maj, who identified the two women as they disembarked the ferry, was able to corroborate at least some of these details. *Id.* at 83-84, 133-34.

Working against the government, however, is the fact that the testimony presented offered few details regarding the extent to which the tip was corroborated. Both Esteves and Ruisanchez testified that it was not until after the dog alerted to García's bag—when García had already been seized—that they identified the women as fitting the informant's description. Dkt. 70 at 84-85, 147-49. Their later corroboration of the tip cannot support the reasonable suspicion that might have authorized García's initial stop. *See United States v. Jones*, 700 F.3d 615, 621 (1st Cir. 2012) (looking to "the facts available to the officer at the moment of the seizure or search") (internal quotation marks omitted). Maj, however, offered the following relevant testimony:

> Question: Okay and on August 24, 2019, while you were at the ferry terminal, were you able to corroborate any of the information you had been provided by Sergeant Ayala?
>
> Answer: Yes, ma'am, we were provided two photos. One photo with both individuals in it and another photo with only one of the individuals and then we were provided information on the clothes and their hairstyles that day and that they would be arriving on the, I believe the one o'clock ferry, 1:00 p.m. around that time and so while we were observing the passengers disembark in that ferry, approximately the one o'clock ferry, we observed those same two individuals disembark from the ferry with luggage.

Dkt. 70 at 133-34. This testimony showed that Maj corroborated the fact that two women would be traveling on the 1:00 p.m. ferry from Culebra to Ceiba (although this likely occurs on every such ferry). It also indicates that Maj recognized two women in light of the informant's tip, but it does not specify exactly which details he corroborated. Did he notice a woman with a purple shirt and her hair in a bun? Did he see that she was accompanied by a woman with her hair down? Did he believe that two women's faces resembled those in the pictures officers had received? Or was all of the above true? The testimony leaves questions such as these—and thus questions going to the extent of corroboration—unanswered. Nonetheless, Maj's testimony that he "observed those same two individuals" suggests some corroboration.

Additionally, no officer seems to have "assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's information." *United States v. White*, 804 F.3d 132, 136–37 (1st Cir. 2015). Indeed, it is not clear that officers had any "independent knowledge" of García's activities or the activities of her codefendant, instead relying entirely on the informant's tip. *Gonsalves*, 859 F.3d at 104.

García argues that I should approach all officers' testimony regarding the tip with some skepticism given that the affidavit submitted alongside the complaint failed to discuss the tip, instead focusing on the fact that the dog alerted to García's bag and officers found apparent narcotics after obtaining consent to search the bag. *See* Dkt. 1-1. According to García, this omission suggests that the tip was nothing more than "an after the fact disclosed pretext for a clear illegal seizure and search." Dkt. 40 at 3. "It is true, of course, that an affidavit submitted in support of a warrant application must demonstrate probable cause in some trustworthy fashion." *United States v. Adams*, 971 F.3d 22, 32 (1st Cir. 2020) (internal quotation marks and citations omitted). Likewise, "a police officer seeking to obtain a search warrant should include in the affidavit accompanying the warrant application any facts known to her that are material to the existence vel non of probable cause." *United States v. Tanguay*, 787 F.3d 44, 46 (1st Cir. 2015). Here, although the affidavit made no mention of the tip, had the information been included, it would have only made the case for probable cause stronger. Moreover, the government presented evidence of officers' text messages among themselves, which showed that they were aware of the tip on the date of García's arrest. *See* Dkt. 75-1 (translating Ex. 3). With this evidence, I am satisfied that officers were aware of the tip on the date of the arrest, even though it was not mentioned in the affidavit presented in support of probable cause.

Having considered the totality of the circumstances, I find that the tip had sufficient indicia of reliability to justify stopping García in the first place, given that it was specific, accurately

predicted certain future activities, and was corroborated to some degree.[8] I also find that, with respect to García's seizure, the initial stop "'was reasonably related in scope to the circumstances justifying the interference in the first place,'" *Flowers*, 359 F.3d at 32 (quoting *Terry*, 392 U.S. at 19–20). Although it took some time for officers to unload the ferry, line up passengers, and conduct the dog sniff, part of this delay would seem inevitable under the circumstances that typically accompany disembarking mass transit with luggage. And nothing suggests that officers acted in any way other than expeditiously when it came to allowing the dog to sniff García's bag, questioning codefendants once the dog alerted, and requesting consent to search the bag. In sum, I find that García's initial seizure was reasonable because it constituted a Terry stop supported by reasonable suspicion.[9]

After stopping García, Ruisanchez searched her bag—a search the government argues was allowed by consent. As explained above, to determine whether consent to search was voluntary, courts look to the totality of the circumstances and consider various factors, including the "consenting party's age, education, experience, intelligence, and knowledge of the right to withhold consent," as well as "whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances." *Forbes*, 181 F.3d at 5 (internal quotation marks and citations omitted).

Here, Ruisanchez and Maj approached codefendants after the dog alerted to their bag. *Id.* at 79, 84-85. Ruisanchez introduced himself with his credentials, asked for codefendants' names, and asked for identification "because the K-9 had alerted positive to controlled substances." *Id.* at 85. He then asked who the bag belonged to, and codefendants explained that it belonged to both of them. *Id.* at 87. Next, he asked whether the bag contained firearms, controlled substances, valuables, or cash, and they both said no. *Id.* at 87. He then asked if they would give officers

---

[8] These facts distinguish the present case from a similar one in this district, where a tip "said only that a vehicle on the ferry was carrying drugs." *United States v. Carmona-Arizmendi*, Crim. No. 13-362, Dkt. 80 at 6 n.5 (Mar. 10, 2014).

[9] For the same reasons, any intrusion into García's personal effects as a result of the dog sniff was also reasonable, as it too was supported by reasonable suspicion.

permission to search the bag "since the K-9 alerted." *Id.* at 88. García responded, "yes," and began

opening the bag. *Id.* at 89. She then put her hand in the bag and moved the clothes inside. *Id.* at

90. Ruisanchez then asked García if he could do that,[10] and García allowed him to do so, at which

point, Ruisanchez felt an object he believed to be cocaine. *Id.* at 90-91.

García's consent was express, as she answered "yes" when asked if officers could search

the bag, Dkt. 70 at 89, and that consent was affirmed when García opened the bag to allow

Ruisanchez to look inside. *See United States v. Miller*, 589 F.2d 1117, 1130-32 (1st Cir. 1978)

(finding defendant's unlocking of a suitcase to be implied-in-fact consent for officers to search the

suitcase). The circumstances were not such that any consent could be deemed coerced. There were

five officers in the general area but only two near García. Dkt. 70 at 95. Although officers were

armed, they did not draw their weapons, never threatened codefendants, and wore civilian clothes.

*Id.* at 75, 86, 89. Ruisanchez spoke in a calm, normal tone, and codefendants were "very nice." *Id.*

at 88, 102. Although García appeared nervous and was shaking, at no point did she inform officers

that they no longer had permission to search her bag. *Id.* at 86, 88, 90. On these facts, I find that

García's consent to Ruisanchez's search of her bag was given voluntarily, rendering officers'

search of the bag reasonable.

Once officers found an object appearing to be cocaine in codefendants' bag, they placed

codefendants under arrest and put them inside an official vehicle. This seizure, too, was reasonable,

as it was supported by probable cause. Indeed, by the time of García's arrest, Maj, Ruisanchez,

and Esteves had all identified codefendants based on the informant's tip, a highly-trained drug-

sniffing dog had alerted to the bag,[11] and Ruisanchez had felt an object that appeared to be cocaine

inside codefendants' bag.

---

[10] Here, I note that Ruisanchez offered somewhat contradictory testimony regarding how he sought
consent. At one point during the testimony, he said, "I told her to allow me to do it." Dkt. 70 at 90; *see also
id.* at 123-24. However, I credit his testimony on redirect, where he clarified that he had asked codefendants
for permission to search the bag. *Id.* at 126.

[11] García does not challenge the reliability of the dog sniff. At the suppression hearing, the
government put on extensive evidence regarding the dog's training and behavior with respect to the alert.
Dkt. 70 at 137-42, 145-57. I find that, in light of that evidence, the dog sniff was reliable.

United States v. García-Sanjurjo, Criminal No. 19-542 (GAG/BJM)                                    23

In sum, García's initial stop was supported by reasonable suspicion, her subsequent arrest was supported by probable cause, and the search of her bag was made pursuant to voluntary consent. Accordingly, suppression is not merited based on Fourth Amendment violations.

Finally, I note that García raised arguments related to potential Fifth Amendment violations in her post-hearing brief, drawing on facts that emerged during the evidentiary hearing. Because these arguments were not raised previously, the government has neither responded nor offered evidence at the hearing regarding the presence or absence of *Miranda* warnings. Accordingly, García's suppression motion based on alleged Fifth Amendment violations should be denied without prejudice. Because the deadline for filing motions to suppress has expired, *see* Dkt. 21, defendant shall request leave of the court prior to filing a separate a motion based on alleged *Miranda* violations.

## CONCLUSION

For the foregoing reasons, the motion to suppress should be **DENIED**.

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 7th day of July, 2021.

<u>S/Bruce J. McGiverin</u>
BRUCE J. McGIVERIN
United States Magistrate Judge